THE STATE OF OHIO, APPELLEE, *v.* NUNLEY, APPELLANT.

[Cite as State v. Nunley (1971), 27 Ohio App. 2d 170.]

(No. 558—Decided June 7, 1971.)

*Mr. James M. Cutright* and *Mr. J. F. Cutright,* for appellee.

*Messrs. Margulis, Gussler & Hall,* for appellant.

GRAY, J. This cause is in this court on appeal from a judgment of the Court of Common Pleas of Ross County

entered upon a jury verdict finding defendant guilty of manslaughter in the first degree. Defendant feeling aggrieved by this result of his trial in the lower court filed his notice of appeal and alleged the following errors:

"First Assignment of Error. The court erred in ruling that the prosecution had established venue.

"Second Assignment of Error. The court erred in admitting the alleged death certificate into evidence.

"Third Assignment of Error. The court erred in ruling that the state of Ohio proceeded properly in attempting to prove the cause of death.

"Fourth Assignment of Error. The court erred in ruling that documentary evidence pertaining to alcoholism on the part of the decedent was incompetent and irrelevant and thus inadmissible.

"Fifth Assignment of Error. The court erred in not declaring a mistrial when one of the jurors was mistakenly contacted at home by the bailiff and advised that he need not appear for duty until seven (7) days hence when the next case would be called.

"Sixth Assignment of Error. The verdict is against the manifest weight of the evidence."

On June 11, 1968 in the Playhouse Bar at 88 West Water Street in the city of Chillicothe the following events occurred. In the afternoon on that date, Martha Buckner walked in the Playhouse Bar with her 5 year old son. As the little boy went past the victim, Edward Okey Woodall, Woodall booted or kicked him. Defendant alleged that it sent the boy 6 feet along the bar. Another witness testified that it didn't hurt the boy, that he did not cry. In any event, this precipitated an argument between Woodall and defendant. Both had been drinking, but the amount and kind of beverage are in dispute. Shortly thereafter, defendant was called to the telephone. He was required to pass by the deceased. Woodall hit defendant. Defendant struck back knocking Woodall to the floor. While Woodall was prone on the floor and in a dazed condition, defendant kicked him in the side. Defendant then stepped over the prone body of Woodall, picked up a bar stool equipped

with chrome legs and brought it down forcibly upon the forehead of Woodall. One of the legs pierced the forehead of the victim and went three inches into his brain. Defendant then ran from the bar. He was later apprehended, charged with manslaughter in the first degree, tried to a jury and found guilty.

We come now to consider the first assignment of error. We believe that is without merit. The record is replete with evidence, including testimony of defendant, that the offense occurred at 88 West Water Street, Chillicothe, Ross County, Ohio. Section 10, Article I of the Ohio Constitution states, in part, as follows:

"* * * the party accused shall * * * have * * * a speedy public trial by an impartial jury of the county *in which the offense is alleged to have been committed* * * *."
(Emphasis added.)

The record shows that Woodall was taken to a Columbus hospital where he died five days later. *Where* Woodall died is not an element of the offense nor has it anything to do with the constitutional rights of defendant.

Defendant in his brief contends that the prosecution failed to prove venue because the physician who signed the death certificate did not see the victim after death; that the place of death is important to proof of venue and, since the place of death was not proven, venue was not proven. This argument is without merit.

Defendant makes much of the fact that the death certificate was signed by a Columbus doctor who did not see Woodall's body after death. This doctor described the surgical procedure taken to remove the chrome leg of the bar stool from the forehead and brain of the deceased. The record shows that when it was removed there was massive brain damage as well as great damage to the bony structures of the skull. Briefly, the doctor testified that (1) the victim was deeply comatosed, (2) after the surgery he became insipidus, a large amount of fluid was produced in his cranial cavity which reflected that there was great damage to the hypothalamus (this is a part that lies deep in the brain and includes vital automatic regulatory cen-

ters), and (3) proper blood pressure could not be maintained. The attending surgeon and physician testified that the injury to the brain caused by the leg of the bar stool being driven into it produced fluid, causing edema and this in turn caused a compression of the brain and ultimately caused death.

The record shows that the intensive care supervisor called the surgeon on June 16, 1968 and told him that the victim was not doing well. The doctor was notified when he died and the coroner was notified. The coroner's office called the doctor and asked him to sign the death certificate. The doctor did so. We discuss the details at some length due to the fact that defendant in his second assignment of error stoutly maintains that it was prejudicial error to admit the death certificate into evidence because the doctor who signed it did not actually see the body after death. We do not think this assignment of error is well taken. Any objection defendant might have had would go to the weight and not to the admissability of this item of evidence.

R. C. 3705.05 states in part as follows:

"Such certified copy of such public record [death certificate] shall be prima-facie evidence in all courts and places of the facts therein stated."

R. C. 3705.27 states in part as follows:

"The medical certificate of death shall be made and signed by the physician who attended the deceased or by the coroner within forty-eight hours after death."

There was no error here.

The surgeon, Dr. Leimbach, testified as follows:

"Q. What was the cause of Mr. Woodall's death?

"A. The effects of cerebral edema caused by the injury to the brain which was caused by the foreign object being driven into the brain."

This was stated as the cause of death in the death certificate.

This question was properly presented to the jury. It resolved the question in favor of the prosecution. No error intervened.

174

Defendant attempted to introduce some records from a justice of the peace court of West Hamlin, Lincoln County, West Virginia. The defense attorney urged their admission into evidence for the purpose of showing that the deceased was an alcoholic, reasoning that therefore he had cirrhosis of the liver, and therefore at some time immediately before the leg of the bar stool was thrust into the victim's brain he become comatose from such cirrhosis of the liver and there is a reasonable doubt as to the cause of death. Defendant at this point is grasping for straws. Dr. Leimbach gave his opinion as to the cause of death. It was not controverted by *any* medical evidence. Defendant's argument does not add up. There are many missing links that he has not provided by evidence. The record shows that the victim hit defendant hard enough just before he was killed to drive defendant hard against a door. It cannot be contended that the victim was comatose then.

Dr. Leimbach further testified as follows:

"Q. Clinically, what accounted for this excess production of fluid and the falling of the blood pressure?

"A. The excess excretion of fluid is a condition which we call diabetes insipidus. It has been described due to injury or inference [*sic*] with physiology called the hypothalamus. Of course frequently injuries also occur when we do surgery on the pituitary.

"Q. You used diabetes insipidus. Does this have anything to do whatever with what we call commonly sugar diabetes?

"A. No. Has to do with excretion of fluid.

"Q. What portion of the brain or body controls the excretion of fluid?

"A. Primarily the hypothalamus.

"Q. How about blood pressure?

"A. Blood pressure is a very complex mechanism in that the blood vessels do have nerve supplies which belong to the anatomical nerve system. When the anatomical system is not functioning, patient goes into shock."

We now address ourselves to the fifth assignment of error. Juror Roush was misinformed that it was not nec-

essary for him to report as a juror on the third day of trial. The trial was adjourned until the next day. An examination of the record shows that when trial was resumed the following day this juror was present. Defendant was given an opportunity to examine the absent juror but refrained from doing so. He took no objection to the proceedings. He has shown no prejudicial error. He made no motion for a mistrial. He did nothing to preserve the question he now raises. This claimed error is without merit.

In the sixth assignment of error, defendant seriously claims that the verdict is against the weight of the evidence. Let us briefly review the evidence. Woodall hit defendant hard enough to drive him up against a door. In turn defendant hit Woodall hard enough to knock him to the floor and daze him. While decedent was thus on the floor defendant kicked him. Defendant, then, stepped *over* the body toward the bar, grabbed a bar stool and jammed a leg of the stool into his forehead and brain. There is medical testimony that nature has provided a thick concave and convex bone formation that is our forehead and this acts as a protection to our brain. It is one of the best engineered parts of our bodies. From the force of the blow the various bones were broken and shattered. The stool leg was wedged so tightly in the forehead that it was necessary to cut it off with pipe cutters before taking deceased in an ambulance to the hospital in Columbus. In order to remove the remainder of the bar stool leg, it was necessary to remove part of the bony formation of the forehead of the victim. When the leg penetrated the forehead and brain of the deceased it produced shock waves and caused the brain to bounce back and forth (contrecoup) producing great and further injury.

Defendant, from the record, would have us believe that he was a protector of little boys. The record shows otherwise. Nunley testified that he was five feet eleven inches tall and weighed one hundred fifty five pounds. Nunley estimated that the victim was five feet eight inches tall and weighed from one hundred seventy-five to one hundred eighty. For defendant to knock deceased off a bar

stool onto the floor and daze the man with one punch demonstrates to us that he was a rather fair brawler. The record bears this out.

A list of defendant's convictions is as follows: (1) Forgery (2) violation of R. C. 2901.25—assault and battery—(3) violation of R. C. 2923.41—disturbance of the peace—and (4) violation of R. C. 2907.23—entering upon the lands of another with intent to steal.

The record shows that the little boy was begging for money among the patrons of the bar. There is no evidence that defendant is related to the boy in any way. Hence, he was a self-appointed protector and a volunteer. This does not give him any legal standing in this brawl. The mother of the boy made no complaint about the incident. Two things stand out in this case. The first is that after the deceased was lying prone on the floor defendant kicked him. Second, defendant then, could have left the bar, yet he stepped over the body and took a bar stool and jammed a leg of it through the forehead and into the brain of deceased. Defendant attempted to convince the jury that he threw the barstool at Woodall. The jury did not believe this version of the events and neither do we. The bar stool legs had rubber cups over the ends. From the medical testimony, it would take a terrific blow, one that was directed and guided and accompanied by great force, to cause the injury to deceased. Defendant became the aggressor when he could have retired without harm to himself when Woodall was lying prone on the floor in a dazed condition. Defendant did not do so and he then and thereby became the aggressor.

We find no merit to the errors assigned and argued. Therefore, the judgment of the trial court is affirmed.

*Judgment affirmed.*

ABELE, P. J., and STEPHENSON, J., concur.